# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LITTLE RIVER LANDING LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2021-0012-SEM |
| | ) | |
| ALLSTATE VEHICLE AND PROPERTY | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

Final Report: July 1, 2024
Date Submitted: February 14, 2024

## FINAL POST-TRIAL REPORT

Richard E. Berl, Jr., HUDSON JONES JAYWORK & FISHER, LLC, Lewes, DE; *Counsel for Plaintiff*.

Arthur D. Kuhl, REGER RIZZO & DARNALL LLP, Wilmington, DE; *Counsel for Defendant*.

**MOLINA, M.**

The primary question pending before me is whether an insurance contract should be reformed to change the listed insureds from the named individuals to the true owner of the real property at issue (an alternative entity). Per the plaintiff, the answer is simple: Yes. The alternative entity always owned the property, the insurance company agreed to insure it, and premiums were paid; the listing of the owner's agent and her husband as the insureds was a mutual mistake worthy of reformation.

Not so, says the insurance company. Property insurance is personal, the agent sought insurance in her individual capacity, and she secured an individual, residential policy. This was no simple mistake, per the insurance company, but rather a careful, deliberate arrangement that differs in material ways from the arrangement that would have been reached had the alternative entity applied. If I reform as requested, the insurance company warns I would be creating a new contract, never intended by the parties.

This is my third tussle with these competing narratives. At the pleading stage, I found the entity owner's quest for reformation was reasonably conceivable. Then, on summary judgment, I found disputes of material fact regarding the representations and understandings underlying the application and eventual policy; those, in my mind, precluded summary judgment. Now, after trial, I am armed with the record necessary to resolve this dispute.

As further explained below, I find in favor of the insurer. Although the entity owner has standing to seek reformation of the policy at issue, the request ultimately fails. The entity owner has not met its burden to prove that the policy should be reformed. Without reformation, the entity's remaining claims for relief must be denied. Judgment should be entered in the insurer's favor.

## I.    BACKGROUND[1]

This action was brought by Little River Landing, LLC (the "Plaintiff") against Allstate Vehicle and Property Insurance Company (the "Defendant," with the Plaintiff, the "Parties") seeking relief related to the insurance on real property located at 108 Omni Road in Dover, Delaware (the "Property").[2] The primary issue is that the insurance contract (as discussed more fully below) does not list the Plaintiff as the insured; it lists Love Mbuntcha, the Plaintiff's sole member, and her husband. To answer whether this is a mistake that can—and should—be reformed, I begin with the factual predicate developed by the Parties at trial.

---

[1] The facts in this report reflect my findings based on the record developed at trial on February 14, 2024. *See* Docket Item ("D.I.") 43–44. I grant the evidence the weight and credibility it deserves. Citations to the trial transcript are in the form "Tr. #." The jointly submitted exhibits are cited as "JX_." Because JX12–14 are deposition transcripts, they are cited as "LAST NAME Dep. __" to avoid any confusion.

[2] At all relevant times, the Property was owned by the Plaintiff, although after the loss addressed herein, the mortgagee foreclosed on the Property, extinguishing the Plaintiff's interests therein. Tr. 93:17–19. The Defendant argues that the foreclosure raises a new standing issue, but I find I need not reach that argument for purposes of this ruling.

## A.   The Plaintiff

The Plaintiff is a single-member Delaware limited liability company.[3]   Its founder, and sole member, is Love Mbuntcha (the "Member").[4]   The Member moved to Delaware from Cameroon, Africa, in 2001.[5]   She initially began a career as a certified nurse assistant and later studied to become a surgical technologist, a position that, as of our trial, the Member continued to hold.[6]

But it is the Member's other line of business that led us to this action. Through "a company called Legacy Education[,]" the Member learned how to flip houses.[7] Through the training, which took around one year to complete, the Member learned "how to look for houses, how to put [an] offer in, how to make it look pretty[,]" and "[i]f it's an old house, how [to do] demolition and bring it back to life and put it back on the market."[8]   In addition to tips on how to locate and purchase homes, the training company advised the Member "not to buy a house in [her] name."[9] Rather, the Member was advised to create a limited liability company ("LLC") and purchase

---

[3] D.I. 39(III)(1).

[4] *See* JX1 (reflecting the Member as the authorized person to file the Plaintiff's certificate of formation); D.I. 39 at 4.

[5] Tr. 53:4–7.

[6] Tr. 55:5–8, 55:17–19. The Member explained that, as a surgical technologist, she "work[s] in the operation room[,]" and "help[s] the doctor with surgery." Mbuntcha Dep. 11:14–15.

[7] Tr. 55:22–56:7.

[8] Tr. 56:11–14, 57:6–9.

[9] Tr. 58:19–20.

the houses through that entity, rather than in her individual capacity.[10] They recommended only using each company for "five to ten houses, and then [to] move to another LLC" for future purchases.[11]

The Member followed this advice and, shortly after completing her training, she formed Legacy Home, LLC ("Legacy") through which she bought, renovated, and sold between five and ten houses.[12] The Member described her business through Legacy as "[v]ery successful[.]"[13]

After this success, on December 21, 2018, the Member formed the Plaintiff as her second flipping entity.[14] The Property may well have been one of the first properties purchased by the Plaintiff.[15] The Member heard about it through a local realtor and, on April 8, 2019, the Member acted as agent for the Plaintiff to purchase the Property.[16]

As was customary with the Plaintiff's business (and the business of the Member's prior entities), the Property was insured through a builders risk policy

---

[10] Tr. 58:19–21.

[11] Tr. 58:21–23.

[12] Tr. 59:23–60:18.

[13] Tr. 60:11–13.

[14] JX1. The Plaintiff purchased numerous other properties, not at issue in this action. *See* Tr. 70:16–72:2.

[15] Tr. 61:20–23.

[16] Tr. 61:9–16. *See also* JX2 (reflecting a special warranty deed for the Property).

until September 2019, with the hope of a quick sale after construction was complete.[17] Construction was complete in or around July 2019 and the Property was promptly listed for sale.[18] But the Property did not sell by the end of September. Thus, the Plaintiff's builders risk policy lapsed, and the Member had to find insurance to fill the gap.[19]

## B.    The Insurance

The Property was ultimately insured by the Defendant, through the Michael Roache Agency (the "Agency"). The Agency is an insurance agency founded by Michael Roache in October 2019.[20] At the time the Member was working with the Agency, the Agency consisted of Mr. Roache, Helena Haileselassie, and two other

---

[17] Tr. 73:17–74:1; JX9. The builders risk policy was under the Plaintiff's name. *See* JX9. To effectuate a quick sale, the Plaintiff entered into an exclusive listing agreement with Olsen Realty, effective July 1, 2019. Tr. 66:19–67:10; JX3. That agreement lists the seller as the Plaintiff, not the Member. JX3.

[18] Tr. 119:21–120:18; JX3.

[19] The Member did not immediately recognize the gap, nor did she work expeditiously to close it. *See* Tr. 98:6–15. The initial policy expired September 28, 2019, and it was only after the Member returned from a trip to Cameroon that the Property's mortgagee informed her that the policy expired, and new insurance was needed. *See* Tr. 75:2–12. When notified, the Member only contacted the current insurer about extending the builders risk policy. Tr. 99:1–6. But that request was denied "because the house was finished." Tr. 99:7–9. The Member did not contact any other insurers. Tr. 99:10–14. *See also* Tr. 121:2–10.

[20] Tr. 4:19–5:1. Before he opened the Agency, Mr. Roache undertook extensive training through the Defendant to become an agency owner. Roache Dep. 36:1–19. The Agency has an exclusive agency agreement with the Defendant to sell its products, namely, insurance policies. Tr. 5:9–12.

employees.[21] As licensed sales professionals, their responsibilities included engaging with prospective customers seeking home, automobile, or life insurance coverage and providing customer service in connection with those policies.[22]

Per the Member, Ms. Haileselassie called the Member first.[23] A bit of context is helpful to understand why. It started with vehicle insurance. The Member and her husband (the "Mbuntchas") insured their automobiles through a different provider and were looking for a change.[24] While the Member's husband explored their options, he was contacted by Ms. Haileselassie, on behalf of the Agency.[25] As they discussed vehicle insurance, the Member's husband informed Ms. Haileselassie that his wife flipped houses, to which Ms. Haileselassie allegedly advised that putting the houses and cars on the same insurance would be cheaper.[26] To discuss, the Member's husband gave Ms. Haileselassie the Member's contact information.[27]

Ms. Haileselassie then called the Member, and their working relationship began.[28] Through multiple phone calls, the Member discussed property insurance for

---

[21] Tr. 5:18–23.

[22] Tr. 6:12–24; Roache Dep. 7:8–18 (explaining the role of a licensed sales professional).

[23] Tr. 75:22–24.

[24] Tr. 76:6–9.

[25] Tr. 76:10–19, 77:7–8.

[26] Tr. 76:10–19.

[27] Tr. 77:9–13. *See also* Mbuntcha Dep. 183:3–184:4 (explaining that the Member's husband has no role in her house-flipping business).

[28] Tr. 77:13–14.

various properties, including the Property, with Ms. Haileselassie.[29] Unfortunately, the Defendant did not properly preserve the recordings of the Member's communications with the Agency.[30] As a consequence of the Defendant's spoliation, I accept the Member's recollection of these conversations as undisputed.[31]

The Member told Ms. Haileselassie that she "had a limited liability company."[32] Specifically, the Member testified that she told Ms. Haileselassie: "I have the LLC, Little River Landing."[33] But when it came to ownership of the Property, the Member testified she "was very confused."[34] Per the Member, she told

---

[29] *See* Tr. 78:24–79:2, 79:19–22.

[30] *See* Tr. 26:18–28:11; 30:15–19.

[31] The Plaintiff requested such adverse inference at trial, relying on *Goldstein v. Denner*, 310 A.3d 548, 567 (Del. Ch. 2024). The Defendant countered that, under *Farley v. Bonefish Grill, LLC*, 2023 WL 2160473, at *3 (Del. Super. Feb. 22, 2023), spoliation was an ill fit. I disagree with the Defendant, find the recordings were spoliated, and draw an adverse inference therefrom. The Defendant instructed the Agency to switch recording providers after this action began and, as such, recklessly, or even purposely, failed to adequately preserve relevant evidence. Without these records, I find it appropriate to accept the Member's recollection of events as unrebutted. I will not, however, go further to infer the ultimate issue (*i.e.*, that the Member did disclose the Plaintiff's ownership or interest in insuring its interest in the Property). Such would be a step too far to address the prejudice from the missing evidence and would directly contradict the Member's testimony.

[32] Tr. 79:8–12.

[33] Tr. 80:8–9.

[34] Tr. 84:9–14. *See also* Tr. 103:13–16 ("Thinking about it, I really didn't know the difference, that I have to say it's my house instead of -- I have to say it's [the Plaintiff's] house instead of saying it's my house."); Tr. 110:11–13 ("Because I didn't know the difference, sir, so I don't think if I would have seen [the insurance policy], I would have called.").

Ms. Haileselassi: "I own the [P]roperty."[35] She said that "[b]ecause [she] owned the LLC."[36] Per the Member, "that's the way [she] think[s]."[37] Further, on cross-examination, the Member expressed that she "didn't understand that there is a difference between owning a company and owning the house."[38] Despite discussions about "the LLC," the Member confirmed she never told Ms. Haileselassie that the Plaintiff owned the Property and was the entity seeking to insure its interests therein.[39]

Ultimately, the Mbuntchas went elsewhere for their car insurance.[40] But the Member, through calls with Ms. Haileselassie, did secure property insurance for the Property and the Member's primary residence located at 444 Lorraine Drive in Frederica, Delaware (the "Lorraine Property").[41] The timing of these policies is

---

[35] Tr. 84:11–12. *See also* Tr. 107:24–108:1 ("When she asked me who owned the house, I said me."); Tr. 108:3 ("I said I owned the house."); Tr. 111:23 ("I told her I owned the houses."); Tr. 113:1–2 ("I told her I own all the properties, sir."); Tr. 110:24–111:1 ("I'm going to say again I didn't know the difference[.]").

[36] Tr. 84:13–14.

[37] Tr. 103:2.

[38] Tr. 102:20–21. Yet, the Member had earlier testified on direct that she knew the Plaintiff, not her personally, owned the Property. Tr. 92:14–17.

When asked about her training and the advice to purchase property through an LLC, the Member explained her understanding was that it was "just in case you have a problem, then you [are] supposed to not get sued." Tr. 103:22–24.

[39] Tr. 108:15–17.

[40] Mbuntcha Dep. 77:7–14.

[41] *See* Tr. 9:1–12.

disputed. Per the Member, Ms. Haileselassie completed both policies through their phone conversations; with the Member answering questions on the phone, and Ms. Haileselassie filling those answers into the special program provided by the Defendant for the Agency to use.[42]

But Mr. Roache testified that Ms. Haileselassie only completed the Lorraine Property piece and, when Ms. Haileselassie went out on maternity leave, Mr. Roache picked up where Ms. Haileselassie left off and completed the form for the Property.[43] Treating the Property as an add-on to the pre-existing insurance for the Lorraine Property, Mr. Roache testified that he began the application for the Property as a new form, linked to the policy for the Lorraine Property.[44] With the "link," some portions of the Lorraine Property application prepopulated on the application for the Property, but Mr. Roache testified that he confirmed the remaining details with the Member on the phone.[45]

The Member does not recall any such conversations. Her recollection is that Ms. Haileselassie completed all applications and after she went out of the office, the

---

[42] Tr. 86:14–17, 115:19–116:1. *See also* Tr. 10:3–12; 13:4–7. *Cf* Tr. 126:4–6 (explaining that the Defendant provides its agents with a system to complete forms on the computer).

[43] Tr. 7:8–12; *see also* Roache Dep. 6:17–21, 39:20–24 (explaining that Ms. Haileselassie was on maternity leave from November 2019 to March or April 2020). Ms. Haileselassie stopped working for the Agency in May 2022. Tr. 8:5–16.

[44] Tr. 9:6–9, 17:18–18:14; Roache Dep. 52:3–11, 56:10–57:5 (explaining that the Lorraine Property was already in the system).

[45] Tr. 31:18–24, 37:2–18, 39:10–12.

Member worked with Mr. Roache solely on payment.[46]  Because, as already noted, the Defendant failed to direct the Agency to preserve recordings of the Agency's communications with the Member and the recordings were destroyed, I will accept the Member's recollection of events over Mr. Roache's.  Such is not a finding that Mr. Roache lacks credibility, but rather an appropriate adverse inference from the Defendant's spoliation.[47]

The application for the Property, which I will presume was created by Ms. Haileselassie, reflects the applicants as the Mbuntchas, not the Plaintiff.[48]  It indicates that the Mbuntchas would be moving into the Property November 2019 and includes protection for personal property and living expenses.[49]  It also cross-references the insurance on the Lorraine Property, which is reflected as effective November 1st, whereas the insurance of the Property is noted as effective November 4th.[50]

---

[46] Tr. 86:14–19. During that payment-related discussion, per the Member, Mr. Roache told the Member he was interested in flipping houses and she offered to teach him for free. Tr. 88:2–6. She testified that their discussion went no further than that; payment and pleasantries. Tr. 87:16–19.

[47] *See supra* note 31.

[48] JX7.

[49] *Id.*

[50] *Id.* Per the Defendant's representative, Megan Thompson-McKenna, the policies are "personal lines[,]" and the Defendant does not "issue any policies to any insured that is not an individual person[.]" Tr. 140:6–13. Per Ms. Thompson-McKenna, the Defendant also does "not insure vacant properties." Tr. 140:21. Ms. Thompson-McKenna also explained

11

Ultimately, on November 11, 2019, the Defendant issued the policy for the Property (the "Agreement"), and mailed it to the Lorraine Property.[51] The Agreement lists the Mbuntchas as the policyholders and named insureds, who are termed as "extending [their] relationship with" the Defendant.[52] The Agreement further defines "[i]nsured person(s)" as the Mbuntchas and relative residents of the household or any person under 21 years old in the Mbunchtas' care.[53]

Consistent with the Defendant's practice, the Property was inspected after the Agreement was finalized.[54] Such inspection occurred on November 18, 2019.[55] The inspection report lists the owner of the Property as the Member, not the Plaintiff.[56] Confusing the matter further, although the Member ensured that the premiums for the Agreement were paid, she did so with funds from Legacy's bank account.[57]

---

that the Defendant's standard procedure, in 2019, was to bind a policy once the application is completed. Tr. 126:24–127:2. Although customers are encouraged, through the electronic confirmation, to sign and confirm the application, the Defendant does not wait for signature to bind and effectuate the policy. Tr. 130:17–24. The policy is bound even before physical inspection of the property. Tr. 131:1–4.

[51] JX8. The Member confirmed that she received a large envelope at her house, which presumably contained the Agreement, but she never opened it to confirm the final policy issued. Tr. 109:13–110:6.

[52] JX8. at LRL068.

[53] *Id.* at LRL075.

[54] Tr. 15:10–12, 131:14–17.

[55] Tr. 16:21–24; *see* JX5.

[56] JX5.

[57] Tr. 89:4–90:5.

12

## C.    The Loss

After a few prior offers, the Plaintiff agreed to sell the Property to Frederick W. Eccleston and Mary M. Eccleston (the "Eccleston Contract").[58]  The Eccleston Contract was signed on December 11, 2019 (by the buyer) and December 12, 2019 (by the seller).[59]  Final settlement was scheduled for early 2020.[60]

But before the transaction closed, there was a fire at the Property.  On the morning of February 16, 2020, the newly renovated home at the Property caught fire.[61] The Member learned of the fire through her realtor,[62] and acted promptly to address the loss—she called the mortgagee for the Property, Mr. Roache, and, when Mr. Roache did not answer, the Defendant.[63]  Addressing what she termed a "total loss," the Member then put in a claim to the Defendant seeking over $406,000.[64] She indicated on her sworn statement, executed on March 10, 2020, that the house

---

[58] *See* JX6. *See also* Tr. 68:21-69:9 (explaining history of offers on the Property).

[59] JX6. The seller was listed as the Plaintiff and the seller's initials were reflected as LRL (Little River Landing, the Plaintiff). *Id.*

[60] *Id.* at 3.

[61] *See* JX15.

[62] Tr. 70:13–15.

[63] Tr. 93:2–13; Mbuntcha Dep. 143:11–24 (explaining the calls she made after the fire).

[64] JX15.

was vacant and that she owned the Property.[65]  Ultimately, she was informed that the Defendant would not cover her claim.[66]

## II.    PROCEDURAL POSTURE

This is not the first court called upon to address the rejected claim.  The Plaintiff initiated this action first in the Superior Court.  On December 14, 2020, in response to a motion to dismiss under Superior Court Civil Rule 12(b)(6), the Superior Court directed that the action be transferred to this Court within 60 days under 10 *Del. C.* § 1902.[67] The Plaintiff complied and, on January 7, 2021, initiated this action.[68]

The Defendant has since attempted every pre-trial offramp; I have denied such relief each time.  On August 31, 2021, I denied the Defendant's motion to dismiss.[69] The Defendant took exceptions, but Vice Chancellor Glasscock affirmed my ruling.[70] Then after discovery was completed, the Defendant moved for summary judgment.[71] That motion was fully briefed by October 6, 2023, and on January 5,

---

[65] *Id.*

[66] Tr. 29:21–30:1, 93:14–16.

[67] D.I. 1.

[68] *Id.*

[69] D.I. 13.

[70] D.I. 21.

[71] D.I. 32.

14

2024, I denied it and teed this matter up for trial.[72] I presided over trial on February 14, 2024, and the Parties stipulated to waive post-trial briefing; thus, I took this case under advisement at the close of trial.[73]

This is my final post-trial report.

## III.  ANALYSIS

As with my pre-trial rulings, I must begin with the threshold issue of standing. The Defendant continues to argue that the Plaintiff is a stranger to the Agreement and, as such, lacks standing to bring this action. The Defendant also contends the Agreement is unreformable due to the Member's lack of an insurable interest. I disagree on both matters.  The Plaintiff has standing to seek reformation, which is all that the Plaintiff needs to establish for a review of the merits of its claims.

The Plaintiff, through the pretrial stipulation and proposed order, narrowed its "issues of law" to three matters: (1) reformation, (2) breach of the reformed contract, and (3) attorneys' fees under 18 *Del. C.* § 4102.[74] Reformation is the door opener, which must be proven for the Plaintiff to recover damages for breach of the reformed contract and statutory attorneys' fees. Thus, after standing, I address reformation

---

[72] D.I. 33, 35, 36. In my order, I stayed exceptions given the impending trial. D.I. 36.

[73] D.I. 43, 44.

[74] This is a reduction from the six counts pled in the complaint, which included a request for declaratory judgment, and claims of promissory estoppel, common law fraud, and breach of the implied covenant of good faith and fair dealing. D.I. 1.

first. As explained further below, I find the Agreement should not be reformed, so the door remains shut to the Plaintiff's other "issues of law." Judgment should be entered for the Defendant.

## A. The Plaintiff has standing.

Throughout this action, the Defendant has argued that the Plaintiff lacks standing. I find the Plaintiff does have standing to seek reformation, which is all that is required for me to move onto the merits of the Plaintiff's claims.

Standing "asks whether a particular party can assert" their claims.[75] To have standing, a party must prove (1) it "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;"[76] (2) there is "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and"[77] (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."[78]

---

[75] *Gandhi-Kapoor v. Hone Cap. LLC*, 2023 WL 8480970, at *7 (Del. Ch. Nov. 22, 2023), *mot. to cert. appeal granted sub nom. GandhiKapoor v. Hone Cap. LLC & CSC Upshot Ventures I, L.P.*, 2023 WL 8769432 (Del. Ch. Dec. 18, 2023).

[76] *Burkhart v. Genworth Fin., Inc.*, 250 A.3d 842, 852 (Del. Ch. 2020) (citations omitted).

[77] *Id.*

[78] *Id.*

The Defendant argues that the Plaintiff lacks standing because "there is no dispute that there was never any discussion about [the Plaintiff] having any involvement with this policy or being involved with the [P]roperty" until the loss.[79] The Defendant also argues that the Member's lack of an insurable interest in the Property renders the Agreement unreformable. Even if I agree on the predicate underlying these arguments, I disagree that they demonstrate lack of standing.

First, standing "is concerned only with the question of *who* is entitled to mount a legal challenge and not with the merits of the subject matter of the controversy."[80] A party does not lack standing because its underlying claim may, or is likely to, fail. That is backwards. Standing asks whether the party can prosecute their claims and seek certain relief; only if the answer is "yes" should the merits thereof be addressed.

Second, despite the Defendant's protestations, "[t]he remedy of reformation is available to reform insurance contracts under the same principles as any other contract[.] . . . Where the insured acts in good faith, makes truthful disclosures, relies on the agent's superior knowledge, experience and representations, and pays the premium, to deny reformation would grant the insurer an unconscionable

---

[79] Tr. 160:2–7.

[80] *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991) (citations omitted, emphasis in original).

17

advantage."[81]  Further, as discussed below, "[m]istakes do occur in identifying the entity or legal person to be insured[,]"[82] and those "can be reformed to reflect the identity of the person intended to be covered by insurance."[83]

Thus, I reject the Defendant's argument that the Member's lack of an insurable interest renders the Agreement unreformable; it would be inequitable to refuse to entertain a request for reformation based on the existence of the very mistake sought to be corrected. If, as the Plaintiff contends, the Parties meant to list the Plaintiff as the insured, the Agreement is not "unenforceable as a matter of law" and is rather ripe for reformation.

The Plaintiff does have standing.  The Plaintiff suffered an injury in fact with the uncompensated loss of the Property, which is concrete, particularized, and actual. There is a causal connection between that loss and the request for reformation; but for the alleged mistake, the loss would have been compensated.  And, if I agree with the Plaintiff that the Agreement should be reformed, it is likely that the Plaintiff's

---

[81] 27 Richard A. Lord & Samuel Williston, *Williston on Contracts* § 70:26 (4th ed.) [hereinafter *Williston*]. Delaware courts often turn to *Williston* for questions of contract law. *See, e.g., Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1229–31 (Del. 2018); *Weinberg v. Waystar*, 294 A.3d 1039, 1045 (Del. 2023); *In re TIBCO Software Inc. S'holders Litig.*, 2014 WL 6674444, at *13–14 (Del. Ch. Nov. 25, 2014).

[82] 28 *Williston* § 70:250.

[83] *Id.*

injury will be redressed. The Plaintiff, thus, has the requisite standing to pursue reformation.

### B. The Agreement should not be reformed.

The Plaintiff has failed to convince me, however, that this Court should reform the Agreement. Reformation is a limited equitable remedy. "Reformation is not an equitable license for the Court to write a new contract at the invitation of a party who is unsatisfied with his or her side of the bargain; rather, it permits the Court to reform a written contract that was intended to memorialize, but fails to comport with, the parties' prior agreement."[84] Delaware law recognizes two doctrines supporting reformation: mutual mistake and unilateral mistake coupled with knowing silence.[85] To prove mutual mistake, the Plaintiff "must show that both parties were mistaken as to a material portion of the written agreement."[86] To prove unilateral mistake, the Plaintiff "must show that it was mistaken and that the other party knew of the mistake but remained silent."[87]

---

[84] *In re TIBCO*, 2014 WL 6674444, at *13 (citations omitted).

[85] *See Collins v. Burke*, 418 A.2d 999, 1002 (Del. 1980) ("The Courts of this State have always insisted in reformation cases on a showing of mutual mistake, or, in appropriate cases, unilateral mistake on plaintiff's part coupled with knowing silence on defendant's part.") (citations omitted).

[86] *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1151 (Del. 2002).

[87] *Id.*

Either doctrine comes with a heavy burden of proof: clear and convincing evidence.[88] This requires "evidence which produces in the mind of the trier of fact an abiding conviction that the truth of the factual contentions is 'highly probable.'"[89] The Plaintiff failed to meet this burden. Rather, I find the Plaintiff was never a party to the Agreement and its exclusion was not the product of a reformable mistake.

**1.      The Plaintiff was never a party to the Agreement.**

Although the Member had authority to purchase insurance on the Plaintiff's behalf, the Plaintiff has failed to prove that the Member contracted on its behalf and that it was an intended party to the Agreement.

As the sole member of the Plaintiff, the Member had actual authority to purchase insurance for the Plaintiff to protect its interest in the Property. As explained in the Restatement (Third) of Agency: "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act."[90] Here, there is no reasonable

---

[88] *In re TIBCO v. Software Inc. S'holders Litig.*, 2015 WL 6155894, at *13 (Del. Ch. Oct. 20, 2015).

[89] *Id.* (citing *Cerberus*, 794 A.2d at 1151).

[90] RESTATEMENT (THIRD) OF AGENCY § 2.01 (AM. L. INST. 2006). "Delaware follows the Restatement of Agency." *Pisano v. Del. Solid Waste Auth.*, 2006 WL 3457686, at *9 (Del. Ch. Nov. 30, 2006) (citing *Billops v. Magness Constr. Co.*, 391 A.2d 196, 198 (Del. 1978)).

dispute that the Member had actual authority to act on the Plaintiff's behalf. But the record does not reflect that she did so in a binding way.

Under agency principles and insurance law, the burden was on the Member to disclose to the Agency that she was acting in a representative capacity. In *Restaurant Equipment Service v. Cohen*, a 1991 decision from the Delaware Superior Court, Judge Herlihy remarked that an "agent has the duty to disclose [her] principal at the time the contract is formed."[91] Although I question such a broad pronouncement, "it is a fundamental principle in insurance law that both the insured and the insurer have a duty to deal with each other with utmost fairness. Accordingly, when seeking insurance coverage, [the Member] had a duty to disclose" all material information.[92] The Member admitted at trial that she did not disclose to the Defendant that she was acting as an agent for the Plaintiff.

This rendered the Plaintiff an "undisclosed principal." The Restatement (Third) of Agency teaches that an undisclosed principal is a party to the contract made on its behalf "unless excluded by the contract[.]"[93] Here, the Plaintiff was excluded. The Agreement defines the insured parties as the Mbuntchas and a limited

---

[91] 1991 WL 113386, at *2 (Del. Super. Apr. 3, 1991) (citations omitted).

[92] *Oglesby v. Penn. Mut. Ins. Co.*, 877 F. Supp. 872, 888 (D. Del. 1994) (first citing *Prudential Ins. Co. of Am. v. Ford*, 144 A.2d 234 (Del. Ch. 1958); and then citing *Dickson-Witmer v. Union Bankers Ins. Co.*, 1994 WL 164554, at *4 (Del. Super. Apr. 27, 1994)).

[93] RESTATEMENT (THIRD) OF AGENCY § 6.03 (AM. L. INST. 2006).

category of residents within the household. Under principles of insurance law, I must read this exclusion as preclusive. "A contract of insurance is essentially a personal contract. It is not a contract to insure property against fire, but is one to insure the owner of property against loss by fire."[94] Thus, the failure to include the Plaintiff in the list of insureds renders the Plaintiff "excluded" by the Agreement.[95]

### 2. The Plaintiff has failed to prove mutual mistake.

The Plaintiff argues that the personal nature of the Agreement was a mutual mistake—that both the Member and the Defendant were mistaken about the record owner of the Property and, as a product of that mistake, listed the insureds as the Mbuntchas, rather than the Plaintiff. I disagree.

Mistakes happen. And, in the insurance world, "[m]istakes do occur in identifying the entity or legal person to be insured."[96] "Where mistakes are mutual, the insurance contracts can be reformed to reflect the identity of the person intended to be covered by insurance."[97] Likewise, "where a mutually mistaken belief results

---

[94] *Draper v. Del. State Grange Mut. Fire Ins. Co.*, 91 A. 206, 207 (Del. Super. 1914).

[95] The Member's lack of disclosure distinguishes it from "[t]he general rule . . . that a contract by a corporate officer or agent need not be made and signed in the name of the corporation to render the corporation liable thereon, if it was the intention of the parties to bind the corporation." *Charles G. Taylor & Sons, Inc. v. Brentwood Const. Co.*, 189 A2d 414, 420 (Del. Super. Mar. 14, 1963). Here, the Plaintiff failed to prove that it was the intention of the Parties to insure the Plaintiff's interests in the Property.

[96] 28 *Williston* § 70:250.

[97] *Id.* (citations omitted).

22

in a signer simply executing the contract in an incorrect capacity, reformation will correct that inaccuracy."[98]  But, here, I there was no mistake. The Member failed to disclose her principal, misrepresented the owner of the Property, and secured insurance for herself, not for the Plaintiff. [99] The insurer relied on the Member's

[98] 28 *Williston* § 70:158.

[99] By terming her conduct a misrepresentation, I do not mean to imply ill motivations or bad faith conduct. A misrepresentation need not be intentional; rather, the Court looks at whether "a reasonable person would have understood the statement to be false or misleading[.]" *Pacific Ins. Co. v. Higgins*, 1994 WL 114898, at *6 n.11 (Del. Ch. Mar. 23, 1994). A reasonable person, with the Member's experience, would have understood that she, as an individual, was not the owner of the Property. Further, the Member's protested ignorance is difficult to believe. The Member touts, on one hand, her experience in creating LLCs and working through those companies to flip houses. Yet she professes ignorance as to the concept of corporate separateness and decries that she should be bound by her representations of the Property as "hers." The Member, by all accounts, successfully purchased and resold real property in the name of multiple LLCs, acting as their sole member and agent.  She also acted on behalf of such entities to obtain loans and insurance. She did so for the Property.  It would be incongruous to find that she was unable, based on limited know how, to do so for purposes of the Agreement.

I am also not inclined to implicitly bless the Member's concerning course of conduct. The Member demonstrated that she knew how to disclose her representative capacity and act on the Plaintiff's behalf. But when it came to this gap-filling insurance she failed to do so. I cannot treat this as unintentional, particularly where there is a likely self-interested reason—a cheaper price for the bundled properties. By disregarding the corporate form, the Member appears to have benefitted herself regarding the Lorraine Property, to the detriment of the Plaintiff, which continued to have its interests in the Property unprotected. Delaware courts do not condone such behavior. *See Harner v. Westfield Ins. Co.*, 2018 WL 6721765, at *3 n.32 (Del. Super. Dec. 12, 2018) (adopting counsel's argument that a party should not be rewarded for taking "the affirmative steps to form an LLC to protect himself and his personal assets and . . . [later] us[ing the] liability 'shield as a sword whenever, you know, whenever it suits him'").

representations to assess the risk of insurance and craft an agreement. To alter the agreement to reflect otherwise would create a new policy entirely.[100]

Even if I were to find the Member's conduct mistaken, such mistake was not mutual, nor was the Defendant knowingly silent. To render the Member's purported mistake mutual or find fault with the Defendant, the Plaintiff appears to argue that the Defendant should have independently discovered the entity owner. I disagree.

A third party "is not required to discover or make inquiries to discover" the fact that the agent "is acting in a representative capacity and the identity of his principal."[101] And "[i]t is a fundamental proposition in insurance law, consistent with Delaware law, that the insurer may rightfully rely upon statements in the application without checking all its files to determine whether the insured is concealing or misrepresenting facts."[102] Moreover, "Delaware courts have even taken this majority rule a step further, holding that even if an insurer should have researched the veracity of an applicant's representations, it has not waived the right" to challenge the concealment or misrepresentation.[103] Thus, even if I were to accept the contention

---

[100] And one that the Defendant's corporate representative testified the Defendant does not offer. Tr. 135:2–4, 140:4–21.

[101] *Frabizzio v. Hendry*, 2016 WL 1298462, at *4 (Del. Com. Pl. Mar. 31, 2016) (citation omitted).

[102] *Oglesby*, 877 F. Supp. at 895 (citation omitted).

[103] *Id.* (citations omitted). *Cf. New Castle Cty. v. Hartford Accident & Indem. Co.*, 685 F. Supp. 1321, 1328–29 (D. Del. 1988) (explaining that an insurer's failure "to make a proper

that the Defendant was "negligent by not researching the veracity of [the Member's] representation, it is not the law of Delaware that such negligence vitiates" the Defendant's well-founded objection to reformation.[104] Thus, I refuse the Plaintiff's request to treat the Defendant's alleged negligence as a mistake or knowing silence.

Simply put, the Plaintiff has failed to present clear and convincing evidence that the Agreement should be reformed as requested.

## C. The Plaintiff's remaining claims and requests for relief must fail.

The Plaintiff's quest for contract damages and attorneys' fees depends on reformation of the Agreement. With my conclusion that the Agreement should not be reformed, these requests should also be denied.

The Plaintiff also requests relief under the theories of promissory estoppel and the covenant of good faith and fair dealing. Arguably these theories are barred by the Plaintiff's failure to list them in the Plaintiff's "issues of law" for trial.[105] But, setting that aside, they also fail on their merits. Taking them in reverse order, the covenant of good faith and fair dealing is inherent in all contracts.[106] But, without reformation, there is no contract from which the Plaintiff can invoke this covenant

---

inquiry into the facts surrounding the risk does not constitute waiver" of a misrepresentation argument).

[104] *Pacific Ins. Co.*, 1994 WL 114898, at *8.

[105] *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.") (citations omitted).

[106] *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017).

against the Defendant.[107]  Promissory estoppel is likewise unavailable because the Plaintiff has failed to conclusively demonstrate that the Defendant made an actionable, real, and reasonably definite and certain promise to the Plaintiff.[108]

## IV. CONCLUSION

For the foregoing reasons, I find judgment should be entered in favor of the Defendant.  Although the Plaintiff had standing to seek reformation of the Agreement, it failed to meet its burden to prove that the Agreement should be reformed.  The Agreement reflects the policy requested by the Member and issued by the Defendant, which never included the Plaintiff as an insured. That exclusion was the product of the Member's misrepresentations, not a reformable mistake. Without reformation, the Plaintiff cannot recover under its remaining claims or requests for relief.

---

[107] *See OptimisCorp v. Waite*, 2015 WL 5147038, at *76 (Del. Ch. Aug. 26, 2015), *aff'd*, 137 A.3d 970 (Del. 2016) ("only parties to an agreement can assert a claim for breach of the implied covenant").

[108] *See Riverside Risk Advisors LLC v. Chao*, 2022 WL 14672745, at *33 (Del. Ch. Oct. 26, 2022), *as corrected* (Oct. 28, 2022), *judgment entered sub nom. Riverside Risk Advisors LLC v. Ching Chao* (Del. Ch. 2023), *and reargument denied*, (Del. Ch. 2023), *and aff'd*, 303 A.3d 51 (Del. 2023).

This is my final report, and exceptions may be filed under Court of Chancery Rule 144. The stay of exceptions on any prior rulings is hereby lifted.

Respectfully submitted,

*/s/ Selena E. Molina*

Magistrate in Chancery